IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANITA TEKMEN, <br><br> Plaintiff, <br><br> v. <br><br> RELIANCE STANDARD LIFE INSURANCE COMPANY <br><br>    Defendant. <br> Serve: <br><br> Registered Agent/Registered Office <br><br> CT CORPORATION SYSTEM <br><br> 4701 Cox Road, Suite 285 <br><br> Glen Allen, VA 23060 | No: 1:18-cv-1304 (AJT/MSN) |

**COMPLAINT**

Now comes the Plaintiff, ANITA TEKMEN, by her attorney, RICHARD D. CARTER, and complaining against the Defendant, RELIANCE STANDARD LIFE INSURANCE COMPANY, she states:

*Jurisdiction and Venue*

1.  Jurisdiction of the court is based upon the Employee Retirement Income Security Act of 1974 ("ERISA"); and, 29 U.S.C. §§ 1132(e)(1) and 1132(f). Those provisions give the district court jurisdiction to hear civil actions brought to recover benefits due under the terms of

an employee welfare benefit plan, which, in this case, consists of a group-long term disability ("LTD") insurance policy ("the Policy"), underwritten and administered by Reliance Standard Life Insurance Company ("RSL"), for the benefit of employees of Adsum, Inc., which includes Plaintiff. Additionally, this action may be brought before this court pursuant to 28 U.S.C. 1331, which gives the district court jurisdiction over actions that arise under the laws of the United States.

2. The ERISA statute provides, at 29 U.S.C. § 1133, a mechanism for administrative or internal appeal of benefit denials. Those avenues of appeal have been exhausted.

3. Venue is proper in the Eastern District of Virginia where Plaintiff resides. 29 U.S.C. § 1132(e)(2); 28 U.S.C. § 1391.

### *Nature of the Action*

4. This is a claim seeking recovery of disability benefits claimed to be due under an employee welfare benefit plan, which provided long-term disability insurance benefits under policy number LTD126118 ("the Policy"). This action is brought pursuant to ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)). Plaintiff also seeks attorneys' fees pursuant to 29 U.S.C. § 1132(g) and ERISA § 502(g).

### *The Parties*

5. Plaintiff, Anita Tekmen ("Tekmen" or "Plaintiff") age 53, was at the time of benefit denial a resident of Haymarket, Virginia; and the events, transactions, and occurrences relevant to Plaintiff's claim of disability took place predominately within the Eastern District of Virginia.

6. Defendant, RSL, was at all times relevant hereto doing business throughout the United States and within the Eastern District of Virginia and delivered coverage to Plaintiff in

the State of Virginia.

7.      At all times relevant hereto, the Policy constituted an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1). Incident to her status as an employee of Adsum, Plaintiff received coverage under the Policy as a "participant" as defined by § 1002(7). This claim relates to benefits under the foregoing Policy.

### *Statement of Facts*

8.      Prior to the onset of her total disability, Plaintiff was successfully employed on a full-time basis as a Senior Financial Analyst with a Top-Secret clearance by Adsum, Inc. on a full- time basis. Her job duties included performing financial management services that include: budget analysis on very complex financial management systems; knowledge of ongoing business processes, strict deadlines, and technical manipulation of financial software and complex formulas; system implementation and conversion; migration of legacy systems; technical financial evaluations and reports; training in new accounting and cost systems and tools.

9.      While employed and actively working, Plaintiff was rear-ended in an automobile crash that was not work related on October 24, 2013 at approximately 9:00 am while she was stopped at a red light.

10.     As a result of the accident her head violently slammed backward into the seat headrest. Upon hitting her head, immediately she felt dazed, stunned, confused, woozy, lightheaded, she suffered from head imbalance and motion sickness, she couldn't speak without slurring and stuttering, as well as sensitivity, in her neck and shoulders. She was initially diagnosed with whiplash and told to remain of work until the symptoms subsided.

11. When these symptoms did not subside she saw Dr. John Kim, an Orthopedist, on October 30, 2013. Dr. Kim performed x-rays and diagnosed her with neck strain and ordered Physical Therapy. He suspected she had also suffered a concussion and referred her to a Concussion Specialist.

12. On November 1, 2013 She was next seen by Dr Frederick W. Parker, III, an Associate Professor of Medicine at George Washington University Medical School and a Board-Certified Sports Medicine specialist who diagnosed her Traumatic Brain Injury and concussion and instructed her not to work for several days.

13. On November 5, 2013, she was seen again by Dr. Parker who noted that her symptoms had worsened and increased her medical leave until November 15, 2013. An MRI given that day showed White Matter Focus, a sign of Traumatic Brain Injury.

14. On November 15, 2013, Dr. Parker diagnosed her with Post Concussive Syndrome (PCS) and at Ms. Tekmen's request, released her to work ½ days.

15. On November 18, 2013 she was seen by Dr. Joanne Balint for Vestibular therapy who recommended various treatments through January 2014. She referred Ms. Tekmen to Dr. Furman.

16. On December 2, 2013, she again saw Dr. Parker who recommended that she reduce her work schedule to 2-3 half days per week, to reduce cognitive thinking and stress and to rest so that her brain could recover.

17. On December 6, 2013 she saw Dr. Yvette Sandoval, a Board-Certified Neurologist, who concurred that she was suffering from Post Concussion Syndrome and a brain shear injury.

18. On December 31, 2013 Ms. Tekmen suffered a major setback as she became ill

after experiencing vibrations and rumbles from a nearby Home Theater subwoofer. After this incident she became incredibly hypersensitive to vibrations, rumbles, sounds and extraneous noises. This began her onset of vibration and sound induced vertigo and overwhelming roaring/humming tinnitus.

19. On January 20, 2014 Dr. Parker diagnosed Ms. Tekmen with newly occurring hyperacusis which is a debilitating hearing disorder where the normal tolerance to sound is collapsed and patients have an increased hypersensitivity to vibratory and auditory stimuli, as well as to different frequencies and volumes.

20. On January 30, 2014, Ms. Tekmen saw Dr. Joseph Gurian ENT who refers her to see Dr. Henry to rule out 3rd window syndrome. Dr Gurian diagnosed her with hyperacusis, tinnitus, vertigo, central vestibulopathy and balance issues.

21. On February 25, 2014, Ms. Tekmen saw Dr Kenneth Henry Audiologist for the Balance Dizziness Center. He diagnosed her with a non-localizing peripheral vestibular pathology. He saw a nystagmus and she failed the SOT platform test. Dr Henry referred her to see Dr. Monfared.

22. On March 7, 2014, Ms. Tekmen cognitively and neurologically began shutting down at work due to the cognitive strain and overwhelming hyper-sensitivity from the overload of surrounding vibratory and auditory stimuli in her office environment. Dr. Parker ordered an immediate extended medical leave of absence for her to rest her brain and to seek 2nd opinions from additional doctors.

23. On March 27, 2014, Ms. Tekmen saw Dr. Jennifer Wiley of Nova Rehabilitation for a Vestibular PT evaluation. She was diagnosed with Vestibular Hyperacusis, Tinnitus,

Nystagmus, and imbalance. She was unable to complete therapy due to her severe balance and hyper-sensitivity issues. Dr. Wiley referred her to see Dr. McKenzie.

24. On April 4, 2014, Ms. Tekmen saw Dr. Ashkan Monfared ENT/Nerotologist who diagnosed her with Post Concussion Vestibular Disorder and Migrainosus Hyper-sensitivity to any stimuli and that she may or may not recover from this.

25. On May 2, 2014, Ms. Tekmen saw Dr. Ruben Cintron Neurologist. He noted that her brain's receptors have been misfiring from the TBI/Concussion, the subwoofer vibrations were yet another negative trigger on her brain causing more neurons to be knocked out of place and more receptors to misfire causing her vibratory and auditory hyper-sensitivities. Dr. Cintron diagnosed her with Extreme Phonophobia Hyperacusis with significant hyper-sensitivity to even the slightest of ambient noise - this is quite disabling.

26. On May 12, 2014, Ms. Tekmen saw Dr. Bryan McKenzie ENT/Neurotologist who noted that he saw a nystagmus and that the CT ruled out Superior Canal Dehiscence. He suggested that her Tinnitus and hyper-sensitivities could be caused from nerves being stretched or torn from the head trauma, which could heal on their own or need surgical intervention.

27. #27. On June 6, 2014, Dr. Joseph Furman, M.D., Ph.D., a Professor of Medicine at the University of Pittsburgh and a Board-Certified Otolaryngologist/Otoneurologist diagnosed Ms. Tekmen with delayed Secondary Endo lymphatic Hydrops caused by the head trauma. It is a disorder of the inner ear which affects the endolymphatic fluid of the cochlea, the vestibular apparatus or both. Symptoms include a pressure or fullness in the ears, tinnitus, hearing irregularity, dizziness, and imbalance. He wants her to try to manage her symptoms with diuretics and low sodium diet.

28. On September 24, 2014, Dr. Parker updated Ms. Tekmen's diagnosis to Bilateral Hyperacusis as now the left ear is also hyper-sensitive to vibratory and auditory stimuli, as well as, having humming /roaring tinnitus. She informed Dr. Parker that she can feel vibrations and rumbling in her head from a lawn mower about 1 block away outside, all while she is sitting inside her office at her desk.

29. On January 20-27, 2015, Ms. Tekmen suffers another major relapse in her new office where a power plant of equipment and generators on the lower floor can be felt vibrating and rumbling throughout the building. She felt an overwhelming presence of vibrations and rumbles. She suffered malaise, nausea, vertigo, wooziness, imbalance, feeling faint, confusion, incoordination, disorientation, attention deficit, vision disturbances, dyslexia, and extreme hyper-sensitivity to any and all surrounding noise or vibration. She took sick leave but these conditions have continued to progress and has become severely disabling.

30. On March 2, 2015, Dr. Bryan McKenzie diagnosed that Ms. Tekmen's central nervous system of the brain has relapsed from this latest vibration trigger in her new office and he suggested trying neuro modulator suppressants through her Neurologist, Dr. Cintron.

31. On March 10, 2015 she saw Dr. Ruben Citron a Board-Certified Neurologist who began treating her for her Brain Injury. On March 20, 2015 she saw Dr. Cintron who began treating her with neuro modulator suppressants. This major relapse came at a time when her brain was still recovering from the TBI and subwoofer incident. Unfortunately, this brings on additional brain damage where more neurons are out of place and receptors more misfiring more than before causing her this extreme amplification and severe hypersensitivities to vibratory and auditory stimuli. Her brain damage has been there since the accident, unfortunately it takes a negative environment or trigger to bring them out full force.

32. On April 6, 2015 Dr Cintron wrote a letter to Ms. Tekmen's employer explaining that she is to avoid all negative noxious triggers and vibratory/auditory stimuli in hopes of recovering from this relapse.

33. On April 6, 2015 Dr. Monfared said that the strong vibrations from the generators have sheared Ms. Tekmen's brains neurons and she may or may not recover from this relapse. He ruled out inner ear issues.

34. On April 22, 2015 Dr. Parker explains that the generator's vibrations have made the chemical imbalance in her brain worse, that her brain got "shook-up" for 6 days while it was still trying to recover from the accident and subwoofer incident.

35. On May 29, 2015, Ms. Tekmen visited the ER due to the overwhelming hyper-sensitivity and roaring humming tinnitus from surrounding vibratory and auditory stimuli ER doctor diagnosed permanent brain damage with lingering symptomatology.

36. On June 1, 2015, Dr. Furman informs her that she may or may not recover from this latest relapse but still wants her to try to manage her symptoms with diuretics and low sodium diet. Surgery can be last resort; however, it is an evasive, risky procedure, and can have lingering, troublesome side effects.

37. As her symptoms grew worse and worse she again saw Dr. Parker on June 2, 2105 who wrote to her employer about her disability and on June 24, 2015 advised her not to return to work because of her increased symptoms.

38. On August 31, 2015, Ms. Tekmen tries returning to work but she had to leave within 2 hours due to exacerbation of her symptoms from vibration and noise. She was neurologically and cognitively shutting down as before.

39. On November 4, 2015 Dr. Parker advises her to remain out of work because

symptoms are incapacitating, and she is not improving.

40. On Dec 1, 2015, Dr. Cintron writes a letter in support of Ms. Tekmen's disability medical leave of absence.

41. On Dec 3, 2015, Dr Parker wrote a letter in support of Ms. Tekmen's disability medical leave of absence.

42. On January 19, 2016 Dr. Cintron recommended trying an alternative treatment plan since Ms. Tekmen is not responding to the neuro modulator suppressants as he had hoped. A full recovery outlook for her is poor. He referred her to see Dr. Esty

43. 43. On February 16, 2016, Ms. Tekmen saw Dr. Mary Lee Esty of Brain Wellness and Biofeedback Center. She had her first treatment of Neuro Biofeedback in hopes of recalibrating her brain back to its baseline. Dr. Esty referred her to see Dr. Prasad or Dr. Wackym as Dr Fitzgerald has retired.

44. Beginning February 18, 2016, Ms. Tekmen started having seizure-like episodes seemingly brought on from the biofeedback treatment. The episodes continue to get more frequent with each passing day and are more severe when she is subjected to any vibratory and auditory stimuli.

45. On March 1, 2016, Ms. Tekmen saw Dr. Parker to discuss the seizures. She eventually feels an episode coming on and both Dr. Parker and his PA were a witness. She was taken to the ER by wheelchair where a CT of the brain was performed.

46. On March 2, 2016, Ms. Tekmen was taken to the ER by ambulance as her seizures are becoming more and more incapacitating and she can't care for herself as her body and mind neurologically and cognitively shuts down. Spinal tap ruled out brain diseases and Lyme disease.

47. On April 27, 2016, Ms. Tekmen saw Dr. Cintron who ruled out seizures with an AEEG. He diagnoses the episodes as convulsions.

48. On May 5, 2016, Ms. Tekmen fainted when a lawn mower drove by outside her bedroom window. She remembers her vision and head started vibrating hard from the reverb rumbling off the bedroom walls and windows. She felt woozy, lightheaded, tunnel vision went black, weakness, and then she collapsed. Dr. Parker ordered a cardiac work up to rule out vasovagal fainting - all came back normal. Cardiologist, Dr. Maghsoudi, stated he felt that this fainting episode came on from her brain or inner ear.

49. On May 17, 2016, Ms. Tekmen saw Dr. Sanjay Prasad ENT/Neurotologist who diagnosed her with hyperacusis and a possible bilateral hydrops with perilymph fistula. He suggested an exploratory surgery, which is an evasive, risky procedure, and can leave lingering troublesome side effects.

50. On July 25, 2016, Ms. Tekmen saw Dr. James Lee ENT for a second opinion on the fistula. CT of sinuses are normal with no infections to cause brain issues. He states that her symptoms are not classic for someone with inner ear vestibular issues. He told her that her brain's nerves are damaged and referred her back to Dr. Cintron.

51. In November 2016, Dr. Parker wrote a letter in support of Ms. Tekmen's disability medical leave of absence and signs the form for her long-term disability benefits claim.

52. On November 22, 2016, Dr. Cintron wrote a letter in support of Ms. Tekmen's disability medical leave of absence and signed the form for her long-term disability benefits claim.

53. On March 8, 2017, Ms. Tekmen saw Dr. P. Ashley Wackym ENT/Otologist/Neurotologist from Rutgers University. He ran some tests which produced a

nystagmus and were suggestive of Endolymphatic Hydrops and possible Labyrinthine Fistulae. Surgery was suggested, which is an invasive, risky procedure, and can leave lingering troublesome side effects

54.     On June 5, 2017, Ms. Tekmen saw Dr. John Carey ENT/Otology/Neurotology from Johns Hopkins. She was diagnosed with Post Concussion Syndrome and possible Vestibular Migraine and bilateral low frequency sensorineural hearing loss suggests bilateral Endolymphatic Hydrops. A Hennebert test proved negative for Perilymph Fistula.

55.     The Injuries, symptoms and complaints of the Plaintiff that have been suffered as a result of the crash from October 24, 2013 until present and described by all treating doctors and neuropsychologists are now:

a. Traumatic brain injury/PCS -permanent with symptoms including; syncopal episodes, persistent/constant headaches, frequent migraines, inability to handle overload of stimuli or multiple noises at one time, loss of coordination, vertigo dizziness, imbalance, light sensitivity, daily memory deficits and short term memory deficits, disturbed vision, slurred and stuttering of speech, decreased attention and inability to and decrease in concentration, inability to focus for a long period of time, inability to follow directions or conversations, inability to process information, dyslexia, social phobia, inability to get a proper amount of hours of steep nightly, insomnia, fatigue, decreased, hearing ability, short attention span, increased feelings of depression and irritability and changes in cognitive functioning, and inability to retain most new information. She also suffers from inability to focus constantly when driving, and increased anxiety when in traffic or a crowded environment.

b. Vestibular Injury\Disorder

  c. Hyperacusis\Vestibular Hyperacusis

  d. Loss of career and livelihood due to traumatic brain injury.

  e. Loss of active lifestyle, hobbies, entertainment and social event gatherings

  f. Migraines.

  g. Tinnitus

  h. Endolymphatic Hydrops

  i Adjustment Disorder with Depression from PCS and Hyperacusis

  j. Seizure like Episodes/ Convulsions.

  k. Neck pain and stiffness

  l. Low Frequency sensorineural hearing loss

  m. Possible Perilymph Fistula

  n. Embarrassment and Humiliation from her symptoms

  o. She now also has a comorbidity of Lyme Disease, contracted since the accident

  56.  The Plaintiff also suffers a co-morbidity depression from her illness, a view that RSL's consulting psychiatrist agrees is disabling but one which RSL has ignored.

### *The Long-Term Disability Plan*

  57.  As a benefit of her employment with Adsum, Inc., Plaintiff received long-term disability coverage under a group disability insurance plan administered by Defendant. The Adsum Plan contained the following Disability standard:

  "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:

  (I) during the Elimination Period and for the first 24 months for which a Monthly

Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;

58.     The RSL Plan defines "Regular Occupation" as "Regular Occupation means the occupation the Insured is routinely performing when Total Disability begins. We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale. See Ex. 1 RSL Plan

59.     Because of her Specific limitations and Restrictions, Ms. Tekmen was at all times relevant Totally Disabled from the material duties of her own occupation or any occupation from September 1, 2015 to the present. The Elimination period for her Disability ended November 30, 2015.

60.     Ms. Tekmen applied for Total Disability Benefits and on May 2, 2016, RSL denied her those benefits claiming that she was not Totally Disabled and claiming that she could return to her own Job. See Denial Ex 2

61.     On November 28, 2016, Ms. Tekmen submitted a timely appeal noting the many errors in the initial Denial The review relied on an Outside Paper Reviewer, Dr. Leonid Topper who is a pediatric neurologist. Dr. Topper is an often heavily criticized paid reviewer for insurers.   See Ex. 3 Appeal of Ms. Tekmen

62. On March 13, 2017 RSL wrote to counsel Denying the appeal. On Appeal, RSL also relied on the opinions of two medical reviewers who never examined Ms. Tekmen, who agreed with her injuries but decided in purely conclusory fashion with no basis, that she was not disabled. The matter is now exhausted and ripe for Adjudication, See Ex 4. Denial by RSL.

## COUNT I

(Failure to provide benefits under ERISA)

63. Ms. Tekmen re-alleges and incorporates by reference paragraphs 1 through and including 62 above.

64. The disability coverage provided to Ms. Tekmen was part of an "employee welfare benefit plan" within the meaning of ERISA section 3 (1), 29 U.S.C. § 1002 (1), in that Adsum's plan was established and maintained for the purpose of providing its participants or their beneficiaries disability benefits through the purchase of insurance.

65. Ms. Tekmen was a "plan participant" of the employee welfare benefit plan established and maintained by Adsum within the meaning of ERISA section 3 (7), 29 U.S.C. § 1002 (7), in that she was or reasonably expected to become eligible to receive disability benefits under the Reliance Standard Life Plan.

66. RELIANCE STANDARD LIFE is a "fiduciary" within the meaning of ERISA section 3 (21), 29 U.S.C. § 1002 (21), in that it exercises discretion with respect to decisions regarding benefits under the plan.

67. Ms. Tekmen is "totally disabled" as defined by the Reliance Standard Life Plan and is entitled to benefits under its terms, and any amendments and/or modification(s) thereof.

68. Ms. Tekmen complied with all terms and requirements of the Reliance Standard Life Plan in requesting disability benefits for her physical disability and providing RELIANCE STANDARD LIFE with information documenting her physical disability.

69. RELIANCE STANDARD LIFE violated the requirements of ERISA section 502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B), by failing to provide benefits under the Reliance Standard Life Plan for which Ms. Tekmen was eligible despite Ms. Tekmen's request for benefits.

70. The denial of these benefits by RELIANCE STANDARD LIFE was and is arbitrary, capricious, and not made in good faith, unsupported by substantial evidence, an abuse of discretion, erroneous as a matter of law, and in violation of ERISA.

71. As a direct and proximate result of RELIANCE STANDARD LIFE's actions, Ms. Tekmen has lost her monthly benefits since November 2015, and will continue to accrue a loss of net benefits hereafter under the terms of the Reliance Standard Life Plan.

72. As a direct and proximate result of RELIANCE STANDARD LIFE's actions, Ms. Tekmen has been caused to incur attorneys' fees in an attempt to secure payment of disability benefits justly due to her.

## COUNT II

(ERISA violation - no full and fair review)

73. Ms. Tekmen re-alleges and incorporates by reference paragraphs 1 through and including 39 above.

74. The disability insurance provided by ADSUM to its employees is part of an "employee welfare benefit plan" within the meaning of ERISA section 3 (1), 29 U.S.C. § 1002 (1), in that ADSUM established and maintained it for the purpose of providing its employees or their beneficiaries disability benefits through the purchase of insurance.

75. RELIANCE STANDARD LIFE is a "fiduciary" with respect to the Reliance Standard Life Plan within the meaning of ERISA section 3 (21), 29 U.S.C. §1002 (21), in that it exercises discretion with respect to decisions regarding benefits.

76. Ms. Tekmen was at all relevant times, a "plan participant" of the employee welfare benefit plan established and maintained by ADSUM within the meaning of ERISA section 3 (7), 29 U.S.C. § 1002 (7), in that Ms. Tekmen was eligible to receive benefits from the employee benefit plan that covered the employees of ADSUM.

77. Ms. Tekmen is totally disabled and is entitled to benefits under the physical terms of the Reliance Standard Life Plan and any modifications thereof.

78. RELIANCE STANDARD LIFE violated ERISA by failing to provide the full and fair review required by ERISA section 503, 29 U.S.C. § 1133. RELIANCE STANDARD LIFE failed to fully consider all of the evidence submitted. RELIANCE STANDARD LIFE also invoked exclusions and requirements not contained in the Plan that covered Ms. Tekmen.

### *Relief Sought*

WHEREFORE, Plaintiff prays for the following relief:

A. That the court enter judgment in Plaintiff's favor and against the Defendant and

that the court orders the Defendant to pay all accrued long-term disability benefits to Plaintiff in an amount equal to the contractual amount of benefits to which she is entitled from November 1, 2015 to the present;

      B.    That the Court order the Defendant to pay Plaintiff compounding prejudgment interest on all contractual benefits that have accrued prior to the date of judgment;

      C.    That the Court Order Defendant to continue paying Plaintiff LTD benefits in an amount equal to the contractual amount of benefits to which she is entitled through the Policy's Maximum Benefit Period, so long as she continues to meet the policy conditions for continuance of benefits;

      D.    That the Court Order that the Life Waiver of Premiums which are a promised part of her benefits be reinstated, that the Life Policy be ordered reinstated and that the funds paid by her to RSL to keep the Policy active be refunded to them

      E.    That the Court Award Plaintiff her attorney's fees pursuant to 29 U.S.C. § 1132(g); and

      F.    That Plaintiff be awarded any and all other contractual and/or equitable relief to which she may be entitled, as well as the costs of suit.

October 18, 2018                                                        Respectfully Submitted,

ANITA TEKMEN

      /s/_____
Richard D. Carter
VSB # 32257
Richard D. Carter, LLC
Attorney for Anita Tekmen
416 Jefferson Street
Annapolis, MD 21403

                              (703) 549-0076 (phone)
                              (703) 542-1273 (fax)
                              rcarter@richcarterlaw.com