IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ANITA TEKMEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-1304 (AJT/MSN) |
| | ) | |
| RELIANCE STANDARD LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION AND ORDER

Plaintiff Anita Tekmen, a former Senior Financial Analyst employed by Adsum, Inc. ("Adsum"), filed this action against her disability insurer, Reliance Standard Insurance Company ("Reliance" or "Defendant"), alleging that Reliance wrongfully denied her claim for long-term disability ("LTD") benefits under a benefit plan ("Plan") governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The parties have filed cross-motions for summary judgment. [Docs. 16, 18] (collectively, the "Motions"). This Court held a hearing on these motions on August 23, 2019, following which it took the matter under advisement.

For the reasons stated below, the Court denies both Motions;[1] but awards judgment in Plaintiff's favor pursuant to Federal Rule of Civil Procedure 52.

---

[1] For purposes of this Order, the Court, finding that good cause exists, also grants Plaintiff's Motion to Amend Memorandum in Support of Summary Judgment [Doc. 42].

# I. STANDARD OF REVIEW

## A. *De Novo* Review

As the relevant policy does not grant discretion to Defendant, the Court engages in *de novo* review of Plaintiff's claim. *See Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 269 (4th Cir. 2002) ("[i]f a plan does not clearly grant discretion, the standard of review is *de novo*.") (citation omitted); *see also* [Docs. 17 at 10; 41 at 2-3]. The task for a district court on *de novo* review is to "consider the issue of whether the plaintiff is entitled to disability benefits 'as if it had not been decided previously.'" *Hughes v. Prudential Life Ins. Co. of Am.,* 2005 U.S. Dist. LEXIS 6188, at *13 (W.D. Va. 2005) (quoting *United States v. George,* 971 F.2d 1113, 1118 (4th Cir. 1992)).  Thus, the 'correctness, not the reasonableness, of [the] denial of . . . benefits is [the Court's] only concern . . . ," *Weisner v. Liberty Life Assurance Co. of Boston*, 192 F.Supp.3d 601, 613 (D. Md. 2016) (quoting *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013)), without any deference to the insurer's prior denial of benefits.

Nevertheless, in order to prevail on a challenge to a denial of benefits, the plaintiff has the burden of proof and must show that she submitted sufficient evidence to show that she was disabled within the meaning of the relevant policy.  *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 276 (4th Cir. 2002).  Accordingly, the issue to be determined here, on which Plaintiff bears the burden, is whether Plaintiff is totally disabled within the meaning of the Plan and thus entitled to LTD benefits.[2]

---

[2] In addition to seeking LTD benefits under the Plan, Plaintiff also seeks, to the extent the Court finds that she is completely disabled from any occupation, reinstatement of her life waiver benefits under the Plan. *See* [Doc. 42-1 at 27].

### B. Procedural Posture

Under the procedural posture of this case, where *de novo* review is required, the Court may conduct a bench trial based on the record pursuant to Fed. R. Civ. P. 52. *See Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 977-980 (E.D. Va. 2005) ("[I]f a district court makes explicit findings of fact and conclusions of law, a bench trial on the record is an appropriate means of disposing of a § 1132(a)(1)(B) claim on *de novo* review."); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999). In doing so, the Court weighs the evidence, including the credibility of witnesses, and issues findings of fact and conclusions of law, as required by that rule.

Upon consideration of the record, the procedural posture of this case and the *de novo* standard of review, the Court concludes that the best course is to decide this case through a bench trial conducted based on the administrative record. As reflected in the following Findings of Fact and the Conclusions of Law, the Court finds and concludes that Plaintiff has demonstrated that she is "Totally Disabled," as that term is defined under the relevant long-term disability policy; that Plaintiff is incapable of full-time work in her occupation as of the Date of Loss and during the Elimination Period; and that she is therefore entitled to receive disability benefits under the applicable policy. The Court therefore finds in Plaintiff's favor and judgment will be entered accordingly.

## II. FINDINGS OF FACT[3]

### A. Relevant Background

Plaintiff was a full-time Budget Analyst/CPIC IT Analyst with Adsum until August

---

[3] The Court's Findings of Fact also includes those findings that are made in connection with its Conclusions of Law.

31, 2015, when she stopped working and applied for short term disability benefits.  AR302–03.

As a benefit of her employment, Plaintiff was a member of an ERISA-governed Reliance group

long-term disability policy.  *See* AR1–34.  Under the policy, long-term disability benefits are

payable if an insured "submits satisfactory proof of Total Disability."  AR17.  The policy defines

"Total Disability" as follows:

> 'Totally Disabled' and 'Total Disability' mean, that as a result of an Injury or Sickness: (1)
> during the Elimination Period and for the first 24 months for which a Monthly Benefit is
> payable, an Insured cannot perform the material duties of his/her Regular Occupation . . . .
> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the
> material duties of Any Occupation.  We consider the Insured Totally Disabled if due to an
> Injury or Sickness he or she is capable of only performing the material duties on a part-
> time basis or part of the material duties on a full-time basis.

AR10.

Regular Occupation is defined as "the occupation the Insured [Plaintiff] is routinely

performing when Total Disability begins."  AR9.  And the Elimination Period is defined as a

"period of [90] consecutive days of Total Disability, as shown on the Schedule of Benefits page,

for which no benefit is payable.  It begins on the first Day of Total Disability."  AR7, 9.  Thus,

based on the dates explained below, the Elimination Period in Plaintiff's case ran from

September 1, 2015 to November 30, 2015.  AR267.

On October 24, 2013, during the time in which she was employed by Adsum, Plaintiff

was involved in a car accident in which someone rear-ended her.  AR778.  She immediately

suffered from neck and lower back pain, dizziness, headaches, and wooziness.  *Id*.  She received

treatment and was released to return to work four days after the accident.  AR879.  Subsequent to

the accident, she continued to suffer from, *inter alia*, balance problems, difficulty concentrating,

dizziness/vertigo, high sensitivity to certain noises and vibrations, and constant ringing or other

sounds in the ears.  *See, e.g.*, AR303, *passim*.  She was ultimately diagnosed with post-

concussion syndrome, hyperacusis (extreme sensitivity to certain sounds), endolymphatic hydrops (fluid buildup or imbalance in the inner ear), tinnitus (persistent perception of noise or ringing in the ears), and vestibular dysfunction (dysfunction of the portions of the inner ear which control balance and eye movements). AR303.

For the next two years, Plaintiff continued to work full-time in her position with Adsum, although she continued to experience symptoms, saw multiple specialists, and tried various medications and therapeutic treatments. *Passim*; *see infra* II.B. Treating Physicians. In or around January 20, 2015, Plaintiff moved to a new office and, according to her, suffered a major relapse that led to exacerbation of her symptoms because of a higher amount of noise and low-grade vibrations in the new office building. *See, e.g.*, AR2544. She took sick leave, *id.*, and tried to return to work on August 31, 2015, but left after two hours on the job due to her symptoms, after which time she filed a short-term disability claim on September 16, 2015, AR302. In 2016, she converted her claim to a long-term disability claim. AR2566. In February 2016, Plaintiff reported that she began to experience seizure-like episodes when subjected to certain noises or vibrations and was taken to the ER by her family physician for a CT scan of her brain. AR1556, 1674, 1689. On May 5, 2016, Plaintiff reported that she fainted when a lawnmower drove by outside her bedroom window. AR1556.

In considering her claim, Reliance hired two independent physicians, Drs. Julius Damion and Leonid Topper, to review her extensive medical records. AR1295–1326, 1330–33. Both concluded that Plaintiff had not experienced a change in her physical condition on or around September 1, 2015, the Date of Loss. AR1306, 1323–24. Both also concluded that she was not totally disabled and retained the capacity to work on a full-time basis. AR1324–25, 1332–33. Based on these opinions and its review of Plaintiff's medical records, Reliance concluded that

Plaintiff failed to establish a long-term disability as defined by the policy and denied benefits. AR266–73.

Plaintiff appealed the decision on November 28, 2016. AR2008–20. During the pendency of the appeal, Reliance retained two additional physicians, Drs. David Foyt and Laurie Truog, to review the file from otologic/neuro-otologic and psychiatric perspectives, respectively. *See* AR1974–84, 1986–2005. Dr. Foyt found that no objective findings supported a change in Plaintiff's condition on or around the Date of Loss and that her "complaints are purely subjective," AR1979–80, and Dr. Truog concluded that Plaintiff had "total functional ability from a psychiatric standpoint as of 9/1/15 and ongoing." AR2003. Based on these opinions and additional review of the record, Reliance affirmed the denial of benefits. AR285–94.

**B.      Treating Physicians**

The record references approximately twenty (20) treating physicians personally seen by Plaintiff in the year following her accident. Those who made relevant findings or observations are summarized below. [4]   The findings of the four (4) independent examiners consulted during the pendency of Plaintiff's claim for disability benefits are also summarized.

### 1. Dr. Ruben Cintron (Neurologist)

Dr. Cintron has personally treated Plaintiff extensively and has seen her and documented her visits since shortly after the 2013 accident. His notes generally indicate that Plaintiff was improving in 2014, but that she had a relapse in February 2015. He noted on October 13, 2014 that Plaintiff was having difficulty working because of her diagnoses of post-concussive vestibular disorder with post-traumatic tinnitus and secondary endolymphatic hydrops. AR5508.

---

[4] Several of those records are simply hearsay summaries contained in a medical diary that was apparently kept by Plaintiff and contain only one or two lines of summary information.

He noted that she was "incapacitated because of her ongoing severe sensitivity to sound and motion for which she has even difficulty sitting in my waiting room because of the sound of people around her." *Id.* He noted that "[t]his impairs her ability to sustain attention and concentration enough to be able to sustain any particular job because of the distraction caused by her symptoms." *Id.*

On March 20, 2015, Dr. Cintron observed that Plaintiff, "who was doing much better when I saw her last time, now is doing terrible." AR5802. He stated that

> she apparently had a relatively high amplitude vibration going on with her building that she had been moved to recently and she could not only feel it but it can set off with her ears and sensitivity to sound at a much higher level than it was prior to going into that building.

*Id.* He stated that he suspected that "this is probably something that hasn't recovered but it was not obvious because she was not in the setting of intense vibration as the building was." *Id.* On October 8, 2015, approximately one month after Plaintiff left her work, he stated,

> She continues to have exquisite hyperacusis but also vibratory sensitivity. Everything in her life right now, socially and occupational is very difficult because of the current problem. There have been several different ideas about a problem pointed out by different specialists but no clear cut explanation of what to do to help this lady. Unfortunately at this point she is not able to work because of stimuli in the building where she's supposed to work which is simply put just not tolerated by her.

AR1589.

Dr. Cintron also wrote a letter in support of her disability claim, in which he stated the following:

> [Plaintiff] suffers from a number of symptoms related to her brain injury from October of 2013 which make her unable to stay in employment. Specifically she has been diagnosed with; number one: post concussive vestibular disorder with post traumatic tinnitus and secondary endolymphatic hydrops, which is felt clinically to be post-traumatic. Although similar to Meniere's disease her

condition in her case is fell to be post-traumatic and does not resolve with diuretics or low sodium diet as Meniere's disease does.  As a result, she is incapacitated because of her ongoing severe sensitivity to sound and motion, for which she has even difficulty sitting in my waiting room because of the sound of people around her.  This impairs her ability to sustain attention and concentration enough to be able to sustain any particular job because of the distraction caused by her symptoms.

As I reviewed the denial letter I noticed that there was a mention of not having a "serious head trauma or lost consciousness"; but as it is stated in the literature loss of consciousness is not necessary for post-concussion syndrome and just the acceleration-deceleration component of the injury to result in neurological symptoms which can last for quite some time.  Although better than she was initially, she is still fairly debilitated from her ongoing symptoms.  It is my clinical opinion that she is not able to maintain a job in the foreseeable future because of her difficulty with distraction resulting from her vestibular hyperacusis or vibration and sounds which induce severe dizziness and imbalance, in addition to cause an unbearable loud humming and tinnitus which affects her ability to concentrate, think, function, or perform her day to day activities.  My hope is that she will improve overtime, but it might take a year or two for her to recover.  I will continue monitoring her.

AR1594.

## 2. Dr. Frederick Parker (Family Physician/Sports Medicine Specialist)

Dr. Parker's documentation is more extensive than that of any other physician in the record. In December 2013, just after the accident, he gave Plaintiff a Sport Concussion Assessment Tool 2 (SCAT2) evaluation score of 18 over 43, which represents the total number of symptoms over the symptom severity rating.  AR0493.  On February 17, 2014, he assessed a SCAT2 score of 21 over 43.  AR0483.  On May 11, 2014, he assessed a SCAT2 score of 11 over 48.  AR0468.  On April 22, 2015, after Plaintiff's alleged relapse, he assessed a score of 19 over 71, which he described as "extremely high."  AR0449–450.  His June 2015 SCAT2 evaluation came out to 19 over 84, even higher.  AR0443.  On August 13, 2015, he assessed her SCAT2 score at 19 over 88.

AR0432–33.  Similarly, she received a SCAT2 score of 21 over 78 on September 3, 2015, two days after she left her job.  AR0429–30.

Dr. Parker saw Plaintiff on September 1, 2015, the same day she left her job.  His notes from the visit that day indicate that the University of Virginia vestibular clinic, which had recently evaluated her, found that she "did have some hearing loss however, the ENT physician did not feel that the hyperacusis was secondary to her ear etiology."  AR1406.  He noted that her "[s]ymptoms continue to be head pressure, balance problems, sensitivity to noise, difficulty concentrating and remembering," and that "[s]he also has periods of confusion."  He observed that "[h]er main symptoms include excessive sensitivity to noise and vibration."  *Id.*

During an October 12, 2015 visit, Dr. Parker talked to Plaintiff about "her emotional situation" and reported that "she agrees that she would be willing to talk to a psychiatrist."  AR0809.  He opined that he believed Plaintiff "needs something to help her deal with the overwhelming hyperacusis symptomatology."  *Id.*  On October 13, 2015, he wrote a letter recommending that she "remain out of the work environment from October 12, 2015 to October 31, 2015."  AR2078.

On October 15, 2015, Dr. Parker filed an attending physician's report as part of Plaintiff's application for disability benefits.  He stated that she suffered from post-concussion syndrome, hyperacusis, endolymphatic hydrops, tinnitus, and vestibular dysfunction.  AR0303.  In the report, he stated that Plaintiff's "symptoms have definitely exacerbated over the past week although over the past 6 months her symptoms have generally been under poor control."  AR1410.  At that time, he recommended that she take a two-week leave of absence from work "to rest and avoid cognitive activities."  AR1411.

On November 4, 2015, Dr. Parker reported that Plaintiff "is unable to tolerate a working environment at this point" because "the vibrations are essentially disabling." AR0621. He also noted that Plaintiff was seeing a psychiatrist. *Id.*

On December 3, 2015, Dr. Parker again wrote a letter in support of her disability claim. He noted that Plaintiff's employer had made accommodations for her in another building, but that her symptoms, specifically her "hyperacusis or sensitivity to noise and vibration" had worsened considerably. AR2077. He noted that she "continues to undergo both diagnostic and therapeutic intervention including medical therapy," and that she would potentially need long-term disability "to return to a full functioning employee situation." *Id.* He further stated that "[b]ecause of the severity of her symptoms and the emotional stress it has placed on her, psychiatrist evaluation is presently in progress." *Id.* On December 16, 2015, he recorded that he had encouraged her to consider taking an antidepressant and stated, "I wonder if an exercise program would be of benefit." AR2104. On January 26, 2016, Dr. Parker observed that Plaintiff was "still out of work unable to tolerate any working situation in that there are significant vibrations." AR1743.

On March 1, 2016, Plaintiff visited Dr. Parker and, according to Plaintiff's medical journal, Dr. Parker witnessed her "being very symptomatic" as to her seizure-like episodes and took her to the ER by wheelchair for a CT scan of the brain. AR1556. After Plaintiff reported her fainting episode after the lawnmower drove by her bedroom window, Dr. Parker ordered a cardiac work-up, which came back normal. AR 3530–32.

In November 2016, Dr. Parker wrote a letter in support of Plaintiff's long-term disability claim. AR2059–60. The letter stated:

> Despite multiple consultations and specialist visits, her diagnosis remains postconcussion syndrome manifested by hyperacusis or magnified auditory stimulation together with periods of seizure-like activity when she is exposed to overwhelming auditory or vibratory stimulation.

She may have endolymphatic hydrops and this diagnosis has been made by at least one other ENT specialist.  Her symptom of hyperacusis is certainly unusual and unique to the post head injury patients.

Despite accommodations at work, she is unable to work on site because of her sensitivity to vibratory and auditory stimulation.

I understand that she does not fit the classic postconcussion patient however, I will vouch for the fact that her disability is severe and she is significantly impaired to the point where gainful work related activities are essentially impossible.

She has been evaluated by psychiatry.  She has faithfully followed up with all recommended specialists including trips to Pittsburgh Baltimore and Charlottesville.

She is reluctant to take medication however has tried a number of agents including SSRI agents and diaphoretic for suspected hydrops.

She has been faithful with vestibular therapy.  She has been very compliant and consistent with follow-up visits and appropriate testing.  Despite her motivation to get better, her symptoms remain persistent and disabling.

I will admit that I have never seen a case similar and one so refractory to time and interventions[.]

She is a bright, intelligent and motivated individual who finds herself essentially incapacitated and unable to perform any activities outside of her home.  This has le[d] to significant financial distress.

She is in the process of seeing additional consultants, which I have encouraged her to do.  She has also considered the surgical options which she would prefer to avoid at this point.

AR2059.

### 3. Dr. John Kim (Orthopedist)

Dr. Kim saw Plaintiff on October 30, 2013, six days after her accident. AR0532. Dr. Kim x-rayed Plaintiff, diagnosed her with a neck strain, and recommended physical therapy. *Id.* He also suspected that she suffered a concussion and referred her to a concussion specialist, Dr. Parker. *Id.*

### 4. Dr. Joanne Balint (Vestibular Therapist)

Dr. Balint saw Plaintiff on several occasions in March 2014. AR5852–54. Dr. Balint recommended several courses of treatment and observed that Plaintiff's symptoms had "slightly improved, but still has dizziness in response to sound, pressure and vibration" and that her symptoms were so severe that she was "[u]nable to be near microwave when food is cooking," "unable to tolerate flushing commode or vibration of truck," and "[s]ometimes the pressure change from putting in earplugs is too much. She has been able to put in 8 hour days at work, but environment (sound/pressure/vibration) is limiting rather than head motion." AR5853.

### 5. Dr. Yvette Sandoval (Neurologist)

Dr. Sandoval saw Plaintiff on December 6, 2013. AR1026–27. She diagnosed Plaintiff with Postconcussion Syndrome and prescribed Neurontin. AR1026.

### 6. Dr. Joseph Gurian (ENT)

Dr. Gurian examined Plaintiff on January 30, 2014. AR5849–50. Dr. Gurian diagnosed her with hearing loss, vertigo/dizziness, tinnitus, hyperacusis, dizziness, and "possible third window syndrome." AR 5850.

### 7. Dr Kenneth Henry (Audiologist)

Dr. Henry's records are only referenced by other physicians in the record. *See* AR1322, AR0626. He examined Plaintiff in March 2014. AR0626. During his consult, Plaintiff could

not complete a Romberg test (which measures equilibrium), and fell during "conditions of no pressure" during the test. *Id.* He also reported that she "was unable to complete" a VEMP test "due to sound intolerance." *Id.*

### 8. Dr. Jennifer Wiley (Vestibular PT)

Dr. Wiley saw Plaintiff on March 27, 2014 for vestibular physical therapy. AR1060–62. Plaintiff did not complete various aspects of physical therapy due to dizziness and instability. AR1062.

### 9. Dr. Bryan McKenzie (ENT/Neurotologist)

Dr. McKenzie saw Plaintiff on May 9, 2014 at Dr. Parker's request. AR4761. He noted that various physical examinations of Plaintiff's head, neck, oral cavity, and ear cavity appeared normal and that her Romberg tested was normal. *Id.* Based on his assessment of Plaintiff's symptoms, which included vertigo and dizziness triggered by sounds and certain vibrations, he opined that "she could have either perilymphatic fistula or superior semicircular canal dehiscence," which is physical stretching, opening, or twisting to the ear canal, as a result of the accident. AR4762.

### 10. Dr. Joseph Furman (Otolaryngologist/Otoneurologist)

Dr. Furman saw Plaintiff on June 6, 2014 and again on June 1, 2015. AR5512. On June 6, 2014, he diagnosed Plaintiff with posttraumatic endolymphatic hydrops, which is a fluid imbalance in the hearing and balance structures of the ear. *Id.* He again stated that this was his impression after the June 1, 2015 visit. *Id.* He noted on June 1, 2015 that her "Romberg was negative" and "[g]ait was normal" but she was "wearing cotton bags in her ears and had headphones around her neck." *Id.*

### 11. Dr. Sanjay Prasad (ENT/Neurotologist)

Dr. Prasad saw Plaintiff on May 17, 2016, a considerable time after she had left her job. AR2651–52. Dr. Prasad observed that "[h]er audiogram is suggestive of bilateral hydops, worse in the right ear," and that a CT scan "revealed no evidence of superior canal dehiscence." AR2652. He stated that in his opinion, "there are two plausible explanations for her symptoms. Endolymphatic hydrops with perilymphatic fistula or hyperacusis from sensitivity to the cochlear fluid wave." *Id.* He advised that both could be treated with exploratory surgery, which Plaintiff was considering at that time. *Id.*

### 12. Dr. Michael Jaffe (Brain Injury Consultation)

Dr. Jaffe evaluated Plaintiff on September 21, 2015. He stated that Plaintiff "reported gradual improvement in [symptoms] from Jan. 2014 to June 2014" but that in "July she moved to a new building and believes that the vibration from new location has re-exacerbated her [symptoms]." AR1919–22. He observed that his examination led to the conclusion that her symptoms were "embellished and without objective evidence of central or peripheral vestibulopathy." AR1922. According to Dr. Jaffe, various MRI and CT scans "have not shown a clear cause for her symptoms," AR1919, her audiology and vestibular evaluations demonstrated mild to normal/excellent results and her cognitive evaluations scored "average or above." AR1920. He recommended that she follow up with a concussion doctor and neurologist. AR1922.

### 13. Steven Singer, LPC

After Plaintiff left her job and at Drs. Cintron and Parker's recommendation, Plaintiff visited Steven Singer, who performed a psychological evaluation on her. AR1188–1213. According to Dr. Singer, Plaintiff acknowledged that she has a "maternal [family history] of hypochondriases" but "made no connection" from this family history "to her own symptoms which

she very firmly believes have a medical etiology." AR1190.  Dr. Singer concluded that "[c]lient's presenting problem and maternal psychological [history] indicate that neuro-psychological and psychiatric evaluations are indicated."  *Id.*  He referred her for a neuro-psychological and psychiatric evaluation and planned for individual counseling with her.  *Id.*

### 14. Dr. Nadia Robertson (Board-Certified Psychiatrist)

Dr. Singer referred Plaintiff to Dr. Robertson for a psychiatric evaluation, which she conducted on December 3, 2015.  AR1214–21.  Based on her evaluation, Dr. Robertson concluded that Plaintiff's symptoms "are most consistent with an adjustment disorder with depressed mood, for which individual psychotherapy and an [antidepressant] would be indicated given the level of symptoms."  AR1220.  Dr. Robertson suggested that Plaintiff participate in a support group, continue individual therapy with Dr. Singer, and take Prozac.  AR1220.  There is no evidence in the record that Plaintiff participated in the support group or followed up with Dr. Singer.

### C.    Independent Examiners

### 1. Dr. Julius Damion (Independent Examiner)

Dr. Damion conducted a lengthy review of Plaintiff's medical history as part of Reliance's consideration of her disability claim.  AR1309–26.  Dr. Damion, however, did not personally examine Plaintiff.  After reviewing the records, Dr. Damion stated that although her symptoms persisted despite vestibular therapy and medication, he believed that her condition had not worsened after September 1, 2015, the date of loss, but he acknowledged that "there was an exacerbation in her hyperacusis and tinnitus on or around February 2015, when she was moved into a new building with increased vibration."  AR1321, 1325.  He summarized his finding as to Plaintiff's disability as follows:

> The claimant has work capacity on a full time consistent basis on or around the
> 09/01/2015 Date of Loss and forward, with the stipulation that a quiet work

environment in which there is no ambient vibration be provided for her.  As noted above, any low intensity noise or vibration causes her hyperacusis to worsen.  She wears ear plugs and noise-cancelling headphones.  For this reason, she needs to be in a quiet environment and not be exposed to noise or vibratory stimuli.  She is capable of sedentary work, as long as she does not need to climb ladders or stairs or work at heights.

*Id.*  As to Plaintiff's long-term prognosis, Dr. Damion opined:

The claimant has undergone extensive therapeutic intervention, including vestibular therapy and multiple consultations with neurology and otolaryngology, and multiple visits to concussion centers.  She has tried multiple medicines without control of her symptoms, which are likely to persist into the foreseeable future.  Pst-concussion vestibular symptoms usually diminish or resolve within one year; that she remains symptomatic 2.5 years after her accident is not a favorable prognostic sign, and it is not possible to predict when or if she will experience improvement.

AR1326.

## 2. Dr. Leonid Topper (Neurologist)

Dr. Topper, also without personally seeing Plaintiff, examined her record to evaluate her from a neurological standpoint.  AR1296–1308.  Like Dr. Damion, he found no change in Plaintiff's condition after September 1, 2015.  AR1306.  In his view, there was no evidence "to establish the presence of any diagnosis neurologically which would explain the physical nature of the claimant's complaints at or around 9/1/15 date of loss.  In other words, there is no evidence of any objective neurological illness affecting the claimant around this timeframe."  *Id.*  With regard to Plaintiff's disability, he tied his finding that she was not impaired to a lack of a definitive diagnosis, stating that her clinical history after the accident "was not compatible with post-concussive syndrome and cannot be explained by any recognizable neurological diagnosis.  In the absence of specific diagnosis, there is no evidence of impairment."  *Id.*  He stated that her neurological examinations and imaging demonstrated only findings of symptom embellishment,

anxiety, adjustment problems, as well as astasia-abasia," and thus that she was not impaired as of the date of loss. AR1307.

### 3. Dr. Laurie Truog (Psychiatrist)

As part of the appeal review, Reliance retained Dr. Truog to review Plaintiff's file from a strictly psychiatric standpoint. Dr. Truog, without personally meeting Plaintiff, opined that Plaintiff has disease-related depression, specifically an adjustment disorder with depressed mood; and based on a lack of evidence that Plaintiff cannot follow commands or is otherwise limited in her cognitive functions, concluded that Plaintiff has "total functional ability from a psychiatric standpoint as of 9/1/15 and ongoing." AR2003–2004.

### 4. Dr David Foyt (Otolaryngolist/Neurotologist)

Dr. Foyt also reviewed a portion of Plaintiff's file as part of the appeal review. He stated that based on his review of the record, there were "no objective findings in the medical records to substantiate the claimant's complaints as of 09/01/2015." AR1979. He therefore concluded that "[t]he claimant's complaints are purely subjective." *Id.* Based on his review, he stated that he could not find "any significant changes in the claimant's medical condition as of 09/01/2015 that would warrant any changes in restrictions and limitations upon that date." *Id.* Although he acknowledged Plaintiff's psychiatric history, he stated that there was nothing from an otologic or neuro-otologic standpoint that would prevent her from working. AR1980.

## III. CONCLUSIONS OF LAW

### A. Plaintiff Has Satisfied the Definition of Total Disability

The record demonstrates that Plaintiff has consistently suffered from the same symptoms since shortly after her accident in 2013. In turn, these symptoms have caused her to be unable to

perform her work. Therefore, she has satisfied the definition of "Total Disability" under the relevant policy.

Reliance centers its argument in favor of denial on the timing; that is, it states that she was able to work for two years in an environment in which aggravating auditory or vibratory stimuli were not present after the accident and only stopped working in mid to late 2015, several months after she moved to the louder and/or more vibratory office in January 2015. *See* [Doc. 17 at 11–13]. Thus, in Reliance's view, Plaintiff's ability to work for two years in spite of her symptoms belies her claim of disability. *Id.* at 19–20. Further, the policy, Reliance contends, requires Plaintiff to be unable to work in her position generally, not with respect to the specific conditions with her current employer. AR9.

However, based upon the record before the Court, the Court finds that the Plaintiff's move to the new office *exacerbated* her continuing symptoms present since her accident in 2013, and those symptoms continued to worsen after she took a leave of absence from work and remained out of work into 2016. *See, e.g.*, AR410. Thus, despite Reliance's characterization of Plaintiff's continued ability to work, the transfer to the new office did more than just make it impossible for her to work there, it essentially led to a significant relapse and consistent worsening of her various, underlying symptoms that first accrued after Plaintiff's accident in 2013.

This conclusion is supported by Drs. Cintron and Parker, both of whom personally and continuously treated Plaintiff throughout the period from 2013 to 2016. Based on their observations, she is unable to work at all; and even a lawnmower outside her window or the vibrations of a somewhat-loud air conditioning unit can trigger seizure-like episodes or fainting. The Court credits these accounts and in doing so, gives greater weight to the reports of Drs. Cintron and Parker (along with the reports of the 18 additional physicians who personally saw

and examined Plaintiff) than the opinions of the independent medical examiners hired by Reliance, none of whom personally examined her and confined their reviews to the paper record. *See Neumann*, 367 F. Supp. 2d at 990 ("[E]xamining experts may be more persuasive than those that merely review a paper record. . . . Put simply, a plan administrator . . . must credit the opinion of a treating physician if that physician does a better job.").

Further, the Court credits Plaintiff's assertion that the independent examiners placed too much weight on the lack of objective evidence in determining that Plaintiff was not totally disabled. *See Hughes v. Prudential Life Ins. Co. of Am.*, 2005 U.S. Dist. LEXIS 6188, at *15 (W.D. Va. 2005) (quoting *Laser v. Provident Life & Accident Ins. Co*., 211 F. Supp. 2d 645, 650-51 (D. Md. 2002)); *see also Hines v. Unum Life Ins. Co. of Am.*, 110 F. Supp. 2d 458, 467 (W.D. Va. 2000) ("[T]his court simply cannot accept the opinion of [the insurer's] own physicians, based solely upon an examination of the paper record, over that of [the plaintiff's] treating physician . . . .").   Regardless of whether there is objective physical evidence of her conditions and regardless of whether anxiety or other psychiatric factors have played a part in her distress, Plaintiff has been faithful with most aspects of her treatment, has tried various strategies to treat her symptoms, and has been consistently diagnosed by more than one examiner with post-concussion syndrome, hyperacusis, endolymphatic hydrops, tinnitus, and vestibular dysfunction. Indeed, the objective physical evidence is not to the contrary; multiple physicians who have personally examined Plaintiff have credited her subjective accounts and have ordered various treatment strategies and aggressive vestibular therapy based on those accounts.

Thus in light of all the more than 6,000 pages of evidence, and the Court's emphasis on the reports of Plaintiff's treating physicians who personally saw and examined Plaintiff, the Court finds that Plaintiff has met her burden to show that she is totally disabled under the policy, i.e.,

that she is incapable of full-time work with essentially any employer as of the Date of Loss and during the Elimination Period.  In short, the opinions of Plaintiff's treating physicians support the conclusion that, for purposes of the Plaintiff's long term disability policy, Plaintiff was unable to perform the material duties of a job for which she qualifies.

## IV.    CONCLUSION

For the above stated reasons, based on the administrative record and the Court's *de novo* review of the record, Plaintiff has satisfied the definition of "Total Disability" under the policy and, therefore, is entitled to judgment that she receive long-term disability benefits under the terms of the Plan retroactive to November 1, 2015.  However, before judgment may be entered pursuant to Federal Rule of Civil Procedure 58, it is necessary to determine the proper amount of the judgment award, including the amount of prejudgment interest; to resolve Plaintiff's claim for attorney's fees and costs, if any; and to determine the amount of life waiver benefits Plaintiff is entitled to under the terms of the policy.

Accordingly, it is hereby

ORDERED that Plaintiff Anita Tekmen's Motion to Amend Memorandum In Support of Summary Judgment [Doc. 42] be, and the same hereby is, **GRANTED**; and it is further

ORDERED that Defendant Reliance Standard Life Insurance Company's Motion for Summary Judgment [Doc. 16] be, and the same hereby is, **DENIED**; and it is further

ORDERED that Plaintiff Anita Tekmen's Motion for Summary Judgment [Doc. 18] be, and the same hereby is **DENIED**; and it is further

ORDERED that within twenty-one (21) days of the date of this Memorandum Decision and Order, the parties file, jointly if possible, otherwise separately, a statement regarding the proper amount of past and future benefits to be included in the judgment, including the amount

of any prejudgment interest to be awarded (with an indication of the applicable rate and beginning date). In the event the parties file separately as to any issue, the parties shall respond to the other's position within fourteen (14) days of its filing; and it is further

ORDERED that within twenty-one (21) days of the date of this Memorandum Decision and Order, Plaintiff file any application for attorney's fees and costs; and Defendant is directed to file any response thereto within fourteen (14) days of the date of Plaintiff's filing.

The Court will decide the above outstanding issues based on the ordered filings and will schedule an additional hearing if it deems one necessary to the decisional process.

The Clerk is directed to forward a copy of this Memorandum Decision and Order to all counsel of record.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 31, 2020